In the Matter of the Application of the LEONHARD MICHEL BREWING COMPANY, Relator, *v.* JACOB A. CANTOR and Others, as Commissioners of Taxes and Assessments, Respondents.

Supreme Court, Kings County, July, 1922.

*Certiorari — taxes — review of assessments — manufacturing property — valuation of land and machinery.*

CERTIORARI to review assessments.

*William Seward Shanahan,* for relator.

*John P. O'Brien,* corporation counsel (*Harry S. Lucia,* of counsel), for respondents.

ASPINALL, J. These are three certiorari proceedings to review the assessments for the years 1918, 1919 and 1920, upon the relator's property, consisting of certain land and the buildings thereon erected, used for the manufacture of ice and beer.

The property is situated in the borough of Brooklyn, in the city of New York, and is known upon the tax maps of said city as lot No. 1, block 466, section No. 2.

The assessment for the year 1918 was fixed by the assessor at $239,000, made up as follows: Land, $78,000; buildings, $39,500, and machinery, $121,500; making a total sum of $239,000.

The total assessment for each of the years 1919 and 1920 was fixed by the assessor at the sum of $192,500, made up as follows: Land, $78,000; buildings, $39,500; machinery, $75,000; making a total sum of $192,500.

By the stipulation of the parties, made in open court, the three proceedings were tried as one, and it was agreed that the evidence adduced during the trial should be considered as the evidence in each of the proceedings.

It was also stipulated that the relator was a manufacturing

company, and that the said company had paid its state income tax for the years above mentioned.

The relator claims in each of these proceedings that the assessment is erroneous by reason of overvaluation; that there was included in the total assessment an overvaluation of certain machinery and equipment, which is claimed by the relator to be personal property and exempt from taxation under the so-called " Emerson Law " (Laws of 1917, chap. 726), and that the said assessments placed upon the land, buildings and machinery should be greatly reduced. Respondents, however, deny the claim of the relator in each of these proceedings and contend that the amount, as made up by the assessor for the years 1918, 1919 and 1920, is correct, and that it should not be disturbed by the court. The evidence adduced during the progress of the trial is voluminous, and I have carefully considered and analyzed the same.

The first question to be determined is as to the valuation of the land. Mr. Hanlon, a deputy tax commissioner of the city of New York, was called as a witness in behalf of the relator. He testified that he assessed the land for the years 1918, 1919 and 1920 at the sum of $78,000 for each year.

Mr. Harrity, an expert called as a witness in behalf of the relator, testified that he assessed the value of the land for the years 1918, 1919 and 1920 at the sum of $78,100 for each year. He based his computation upon a valuation of $1,500 for a lot twenty by one hundred feet on Third street, plus thirty-three and one-third per cent for a corner lot, $3,000 for a lot with a frontage on Gowanus canal, and $1,000 a lot for the interior lots, making a total of $71,000, plus ten per cent additional for plottage, making the total valuation of the land the sum of $78,100.

Mr. Larkin, an expert called as a witness in behalf of the respondents, testified, in substance, that he valued the land for these years at the sum of $103,634 for each year. In fixing this fee valuation, he did not consider the assessed valuation, nor did he adopt a standard lot value on Gowanus canal or Third street. His fee valuation was based upon a square foot value of $1.45 for the entire tract. According to his method of computation this factor of valuation would be $100 a running foot for lots on Third street and $275 a foot for lots fronting on the canal. He testified that this valuation of the land on Third street was based on sales on that street. In my opinion, this assertion cannot be justified by the evidence, for it appears from his own testimony that the only sale on this street was the so-called Williams sale, and that there were very few sales of any character in that vicinity. The Williams sale was made under very peculiar conditions. It was made in the stress of the World War, and the property was an

absolute necessity to the purchaser. This fact the witness did not dispute. In my opinion, the higher land valuations of the witness Larkin find no justification in the evidence, and I accept and adopt the valuations of the witness Harrity, which practically are the same as the assessed valuations.

The next question to be determined is as to the valuation of the buildings.

There is a wide diversity among the experts as to the value of the buildings. Mr. Hanlon, the deputy commissioner of taxes of the city of New York, testified that he assessed the buildings for the years 1918, 1919 and 1920 at the sum of $39,500 for each year. In arriving at this valuation, he considered the structural value, or cost of replacement, less depreciation, as of a period of four or five years back, and not as of the taxable status dates for the years in question.

Mr. Harrity, the expert called in behalf of the relator, testified that he assessed the buildings for the year 1918 at the sum of $44,824.45, for the year 1919 at the sum of $43,874.45, and for the year 1920 at the sum of $42,949.45; that he allowed three per cent per year for the depreciation on the frame buildings and two per cent per year for the depreciation on the brick buildings; that his valuations were not based upon structural value, or cost of replacement, but upon a capitalized rental value; that he took into consideration the locality of the property and the character of the buildings, and the uses for which they were adaptable, and then estimated the fair rental value at fifteen cents per square foot. This he capitalized at twelve and one-half per cent, and he justifies his conclusion in respect to the square foot rental value by reference to other property which had been rented for less.

Mr. Dyer, an expert called as a witness in behalf of respondents, gave a detailed description of the buildings, their dimensions, and manner of construction, and the materials used. He separately valued the principal buildings, and also other buildings and equipment, including the freezing plant, dock, fence, brewhouse, engine room, garage building, elevated driveway to the dock, and the paving. He testified that the structural value of all these buildings and equipment, as of the taxable status dates for the three years, were the following sums: For the year 1918, in the sum of $296,738.03; for the year 1919, in the sum of $346,908.48; and for the year 1920 in the sum of $405,197.77, allowing in each instance a certain per cent for depreciation. In arriving at these valuations, he considered the prevailing prices of labor and materials as of October 1, 1917, and the basis of his valuations was the structural or cost values of materials, plus builders' percentage and architect fees. Although he testified that, from the year 1914 to the year

1919, there was an average increase in the price of labor of only 93 per cent, and in building materials of only 109 per cent, yet his estimate of the structural value of the buildings was approximately from seven to ten times greater than the valuations as fixed by the assessor and by the witness Harrity. While the cost of reproduction is a factor that may be properly considered, I have been unable to find any justification in the evidence for these valuations, and in my opinion they are extremely excessive and must be rejected.

Mr. Larkin, one of the expert witnesses called in behalf of the respondents, valued the buildings for the year 1918 upon the theory of a going concern, fixing the valuation the property would, in his opinion, sell for, under ordinary circumstances, and for the two following years his valuations were based upon a capitalized rental value. He estimated the rental of the various buildings at from twenty cents to forty cents per square foot. He valued the entire property, exclusive of machinery, at the sum of $267,634 for the year 1918, and at the sum of $234,834 for each of the years 1919 and 1920. He valued the land alone at the sum of $103,634. Therefore, deducting his land valuations, it appears that he valued the buildings as of October 1, 1917, at the sum of $164,000, and as of October 1, 1918, and 1919, at the sum of $131,200. He testified that he did not consider the assessed valuations, and he gave no specific instances of leases in that vicinity, which, in my opinion, justified his square foot rental valuations. After carefully considering all of the evidence, I have accepted and adopted the valuations which the witness Harrity arrived at, and which are slightly in excess of the valuations of the assessor. These valuations are as follows: For the year 1918, $44,824.45; for the year 1919, $43,874.45, and for the year 1920, $42,949.45.

The next and last question to be determined is the removability of the machinery from the buildings, and whether or not the machinery and equipment is exempt from taxation under the law for the years 1918, 1919 and 1920.

Much evidence was introduced relating to the functions of the various articles of machinery and equipment, and the manner of its affixation to the buildings, and its removability. I have carefully considered all of this evidence. A part of the machinery rests upon the floors of its own weight, a part is fastened to the floors or walls by screws, bolts or other simple contrivance, and a part rests upon heavy concrete foundations, constructed for the purpose, and to which it is securely fastened by more intricate and elaborate methods and contrivances. Without doubt, the larger portion of this machinery is easily removable through windows and doors, and a considerable portion thereof is so removable in

parts after being dismantled. A portion of the machinery, however, is of very large dimensions, such as the compressors and various tanks and vats, and the removability thereof was seriously disputed upon the trial. The respondents contended that such machinery could not be taken out of the buildings without either destroying it, or working material injury to the floors or walls of the buildings in the process of removal. Mr. Greene, an expert called by the respondents, so testified in great detail, but on cross-examination he admitted, practically, that all machinery can be dismantled and then removed, although he claimed that in some instances the process of dismantling would result in the destruction of the machine; in fact, he cited instances where an entire brewery had been removed and " cleaned out," and he admitted finally that the only machinery that could not be removed after being dismantled was the compressors and certain freezing tanks. These, he claimed, would be destroyed in the work of removal. It may be here said that injury to the machine itself, while being removed, is not the test of taxability. Under the provisions of section 219-l of the Tax Law, the machinery in question is personal property, and so not taxable if it may be removed without material injury to the buildings. Mr. Ramsey, an expert called in behalf of the relator, generally described the machinery in the ice plant, and testified that all of it was removable after being dismantled. Mr. Schock, a witness called in behalf of the relator, gave similar testimony as to the removability of the machinery in the brewery. It further appears from the evidence that the largest machine (one of the compressors) was brought into the building to its present location through what was known as a curtain wall. Formerly, this was a door fifteen feet high by eight and one-half feet wide. The space occupied by this door subsequently was filled in with brick without cement. According to the evidence, the largest single part of any machine, after dismantling, could be removed through this door upon taking out the brick. It also appears by the evidence that the various parts of the dismantled machinery also could be removed through certain windows if the window sash were taken out.

The respondents also contend that certain of the machinery or appliances are not personal property, because, under section 219-l of the Tax Law, it is " equipment consisting of structures or erections to the operation of which machinery is not essential." In this category are placed twenty-eight tanks, thirteen vats, brew kettles, settling tank, fermenting vats, the racker apparatus, and possibly other equipment. In my opinion, the learned counsel for the respondents is mistaken in his reading of this section. The articles enumerated may be equipment, but if so they are

equipment used for trade and manufacture, and not " equipment consisting of structures or erections," and it is not claimed that any of the machinery or equipment here involved was essential " to the support of the buildings." Without further reference to the evidence, I conclude, excepting as hereinafter specified, that none of the machinery and equipment here involved is essential for the support of the buildings; that none is equipment consisting of structures or erections, and that all is removable without material injury to the buildings in which it is variously located. I further conclude that all such machinery and equipment was personal property, as defined by section 219-1 of the Tax Law, as added by chapter 271 of the Laws of 1918, and also as defined in that section, as amended by chapter 628 of the Laws of 1919. It seems clear to me that the words " material injury " in this section are used in a relative sense. Damage to the extent of the sum of $500 to a building worth $2,000 might be material, but damage to the extent of a sum of $1,000, or even more, to a building worth $50,000, occasioned during the removal therefrom of machinery of the value of $100,000, might not be deemed to be a material injury, within the purport of a statute of the character of the one under consideration. In my opinion, no evidence was adduced during the trial warranting the conclusion that the removal of any of the machinery here involved would occasion material injury to the buildings. It follows that such machinery was exempt from taxation under the law for the years 1918, 1919 and 1920.

It is admitted, however, that certain machinery is taxable, and the relator has adopted some of the valuations placed thereon by the respondents. The valuations, however, of the boilers is sharply disputed. Four of these boilers had been removed prior to the year 1921, but subsequently to the taxable status dates for the three years, and replaced by two new boilers. They were removed because of their age and the fact that they had been condemned by the city authorities, and the amount of pressure permitted to be placed on them had been reduced. Mr. Meyer, a witness called on behalf of the relator, valued all of the seven boilers at the sum of $500 each, making a total valuation of $3,500 as of October 1, 1917, and for the two following years he reduced this valuation to the sum of $2,800 and $2,100, respectively. Mr. Greene, the expert for the respondents, however, valued the three boilers which had not been removed at the following sum for the three years respectively: One Keeler, 500 horsepower boiler, at the sum of $8,800, $9,800 and $10,900. One 200 horsepower boiler at the sum of $2,380, $2,620 and $2,920. And one Keeler boiler at the sum of $1,780, $1,980 and $2,120. He testified that these amounts were, in his opinion, actual values. The increased

valuation each year is explainable on the theory that the per cent of increase in the values of boilers during these three years was greater than the per cent of depreciation arising from use. In my opinion, these valuations more nearly represent the actual market values than do those of the expert for the relator, who placed the same valuation of $500 upon the 500 and 200 horsepower boilers in actual use that he placed upon the four boilers that had been discarded because of their age and worthlessness; but as to the four boilers that had been discarded, I have accepted and adopted the valuations of the expert for the relator.

I, therefore, find the value of the boilers and the other machinery admittedly taxable to be as follows for the year 1918: One boiler, $8,800; one boiler, $2,380; one boiler, $1,780; four boilers, $2,000; one Corliss engine, $1,550; shafting, $900; Foster pumps, $460; elevator, $900; making a total sum of $18,770. For the year 1919 one boiler, $9,800; one boiler, $2,620; one boiler, $1,980; four boilers, $1,600; one Corliss engine, $1,850; shafting, $1,020; Foster pumps, $490; elevator $900; making a total sum of $20,260. And for the year 1920 one boiler, $10,900; one boiler, $2,920; one boiler, $2,120; four boilers, $1,200; one Corliss engine, $2,000; shafting, $1,120; Foster pumps, $520; elevator, $900; making a total sum of $21,680.

I find the value of the land, buildings and machinery taxable for the year 1918 as follows: Land, $78,100; buildings, $44,824.45; machinery, $18,770; making a total sum of $141,694.45. For the year 1919: Land, $78,100; buildings, $43,874,45; machinery, $20,260; making a total sum of $142,234.45. For the year 1920: Land, $78,100; buildings, $42,949.45; machinery, $21,680; making a total sum of $142,729.45. And I, therefore, find that said several assessments should be reduced accordingly.

Judgment accordingly.